Are you going to be dividing time, counsel, or not? No, we are not, Your Honor. Okay. Very good. Good morning, Your Honors. My name is Mark Rifkin of Wolf, Haldenstein, Adler, Freeman & Herz, and I will be presenting argument on behalf of the appellants. I'd like to reserve three minutes for rebuttal, if I may, and I understand I have to try to keep track of that time. The district court in this case dismissed the plaintiff's conspiracy to monopolize claim against Apple for failure to join AT&T Mobility as a necessary and indispensable party under Rule 19. In doing so, it's our view that the district court ignored three-quarters of a century of jurisprudence from the Supreme Court and from this Court that established a very clear general rule that any trust co-conspirators need not all be joined in a single action for that action to proceed. Mark, before we get too far down the road, I want to be sure I understand something. Of course. If the wireless service agreement, I should say agreements that exist between, I'll call it AT&T rather than ATTM, AT&T and its customers did not contain an arbitration clause, is there any question that the plaintiffs would have sued AT&T as well as Apple? Your Honor, the answer to that is the plaintiffs would likely have sued AT&T. And why would they have done that? Why would they have? Why would they have done that? Well, we believe and we have certainly alleged that AT&T and Apple, in fact, conspired to monopolize the aftermarket for voice and data service. The alleged conspiracy, of course, was between these two parties. And as between the two parties, the lock-in agreement seemingly primarily benefited AT&T. They're not going to want to get its money back for having bought the phones, partially bought them on behalf of the customers. No, we think that the lock-in agreement was part of the exclusivity arrangement between Apple and AT&T that was in effect until it was terminated. Yeah, I understand that. I'm just trying to understand the ultimate benefit of it. Correct me if I'm wrong, but my understanding is when they entered into this agreement, the exclusivity agreement and the lock-in arrangement, Apple wanted something, AT&T wanted something. Apple wanted to sell phones. AT&T wanted to get back its money for selling the phones and wanted to make money on its data and phone services. It was going to share those profits with Apple. Is that right? Correct. Okay, so in this case, if someone has a phone and they can willy-nilly switch out the SIM card and switch over to Verizon, then the benefit of the bargain, at least from AT&T's perspective, is lost, right? But AT&T made an agreement with its customers in those wireless service agreements that any customer who wanted to shop for another carrier in the aftermarket could do so either by satisfying the terms of the agreement over two years or by paying an early termination fee before the expiration of two years. What no customer agreed to with AT&T was that it would be bound to use AT&T, notwithstanding the early termination provision, and that at least under the original agreement that was in place when the customers originally bought their iPhones, that they would be bound to use AT&T not just for two years, which is the term of the wireless service agreement, but for five years under the term of the exclusivity agreement, the revenue-sharing agreement between Apple and AT&T. Was the two-year, I call it breakout, between AT&T and its customers true in the original agreement as well as the current agreement? In other words, when the five-year arrangement was there, did a customer of AT&T have the right to basically pay the two years' worth and then get out during that period? If I understand Your Honor's question, the answer is yes, and let me make sure I understand it and that I'm answering it correctly. Under the wireless service agreement, the service contract between AT&T and its customers, when the five-year exclusivity period was in effect, yes, it purportedly gave AT&T's customers the option to serve two years and then transfer service to another carrier, or during that initial two-year period to pay an early termination fee of I believe it was $275 and then go shop in the aftermarket for another carrier. So there was an inconsistency, and I think that was the point Your Honor's question was really asking. That's what I was struggling with because I didn't read that as being a variant on the five-year lock-in in the original agreement. And in fact, that's part of the claim is that customers were unknowingly bound by the five-year agreement that existed between Apple and AT&T, despite the fact that they had a two-year agreement with AT&T and the right to terminate at any time. Does the record show whether customers of AT&T under their, I'll call it WSAs, did in fact terminate their agreements after a two-year period or pain the penalty indicated, notwithstanding the fact they didn't know there was a five-year lock-in with Apple? The record, such as it is, is just the complaint. Yes, it's alleged in the complaint that they were bound by the five-year term of the agreement, which now since has expired, and that's a very important point that we've made. Right. But, yes, they were bound by that five-year agreement, notwithstanding the fact that they had the right to shop after two years or pay their early termination fee and shop sooner than two years, but that it was taken away from them. So I hope I've answered all those answerable questions. So this, though, the reason I ask the question is because I'm trying to understand Judge Ware's viewpoint about how important it was to have AT&T involved in the case. Everybody knows that you don't have to join a joint tortfeasor in an antitrust setting in order to go forward. That's put to the side. The question is whether under Rule 19, whether the interest that AT&T has is of sufficient importance that they must be joined. And our case law is pretty flimsy on this. We don't really have much. We have some with some Indian tribes, which are somewhat unique because they're sovereign nations. Correct. We've got the Laker Airways case, which involves a British entity, a regulated entity. But on the other hand, AT&T is also a heavily regulated entity. And, Your Honor, I don't mean to interrupt, but I do want to make a point that I think is extremely important. In the Laker Airways case, the Eleventh Circuit recognized the uniqueness of the facts that it was dealing with. And, in fact, the Court said very explicitly, it says, we're not dealing with a situation of a routine joint tortfeasor here. And the Court then went on to say that the practical effect of an adverse determination in that case would not just be the loss of business on the part of ACL. That was the company that was assigning these landing slots for British airports. The government-related entity or something like that. They would have been. That's correct, Your Honor. And under British statutory authority, they would have been effectively put out of business. Now, in no way did Judge Ware, in his decision, make anything even remotely close to that sort of finding. What he said, and it's on page 20 of the excerpts of record, he says that in order to evaluate the plaintiff's antitrust claims, it's necessary for the Court to evaluate AT&T's conduct, insofar as plaintiffs allege that AT&T unlawfully achieved market power in the aftermarket. Respectfully, Your Honors, that same comment may be made in every single case in which there is an antitrust conspiracy between more than one actor. The fact is, Judge Ware's explanation for what he found to be AT&T's special interest, and he didn't use the term special interest, but what he found to be AT&T's ---- Interesting. That's right. And we all know about Washington. The fact is, Your Honor, that nothing that Judge Ware said in his opinion indicates that he found that there was some compelling reason to have AT&T here that wouldn't be present in the case of every co-conspirator in an antitrust conspiracy. And for that reason, we suggest that even if this Court were to consider adopting the Laker Airways decision as a new rule in the Ninth Circuit, which we don't believe it should do, and the Court were to disregard the fact that Laker Airways involves a British sovereign and the relationship between the sovereign and ACL, the non-party in that case, the fact is that even strictly speaking under the language in that case, the Court says that there is this very compelling need to have ACL there to defend itself that simply isn't present here. There's no existential threat to AT&T. What about ---- Oh, sorry. Go ahead. Judge Ware says that the contract of AT&T is threatened, and therefore, it's necessary to be on. Was that determination erroneous? Well, we believe it was, Your Honor, for a couple of reasons, the most obvious of which is what we've explained in our reply brief. But that's that it had already expired. The contract that we challenged that gave AT&T this exclusivity for five years, and that apparently prohibited Apple not just from unlocking phones itself, but also from sharing the codes with others so that others could unlock the phones, that was agreement that did not provide for exclusivity, and also did not prevent AT ---- did not prevent Apple from providing the unlock codes to third parties. Apple could ---- Well, there's two areas where the contract may come in. Number one, you don't get money, you should. Number two, you're going to get sued by other people on the old contract. Which ---- which reasoning did Judge ---- did the district judge use? Your Honor, I don't believe that Judge Ware addressed either of those issues. Judge Ware essentially said that AT&T would have to defend its business model. And that's the point of our appeal, is that if the reason for joining an antitrust co-conspirator is so that that non-party can have the right to defend its business practice, then we do away with the general rule for three quarters of a century. Have you seen the full contract that we have the snippets of here? No. We've only seen the parts of the contract that Apple wants us to see. That is correct, Your Honor. What do we do with the fact that AT&T is in a highly regulated area of the law? You've got the FCC. I'm not sure how much role the PUC in California has. But you've got all these consumer laws in California. They're watched like a hawk. Congress obviously is aware of this because they have the Unlocking Consumer Choice and Wireless Competition Act, which was recently passed, which shows that somebody was looking at this. Why wasn't Judge Ware correct? You may not have articulated all of this, but why wasn't he correct in noting the fact that, as in Laker, which was a little bit different, of course, you've got a highly regulated slot allocator and you've got, if you will, a phone allocator, highly regulated. There are certain things they can do, certain things they can't do. Laws prohibit them from violating antitrust laws. Congress is watching them. The legislature is watching them. The attorney general of the state is watching them. Doesn't that give a little more credence to his concept that they had an interest, an important interest to protect here, that if there were a big lawsuit, and of course, by definition, with companies of this size and publicity that would follow, everybody would know about what happened and all the allegations. Why isn't that important? Your Honor, I think you've asked a very good question. Thank you. It would, of course, be presumptuous of me to assume that anything I do in private litigation would in any way influence what all these regulators, state regulators and federal regulators do to enforce the various laws and rules that they're responsible for enforcing. With respect, counsel, you seem like a very good lawyer and I'm sure a very smart person. Everything related to Apple, everything related to AT&T makes headlines. Absolutely. They're huge companies. They affect lots and lots of people. And everybody knows about every allegation. You can't go to any page at all without hearing something out of the federal district court in Northern District of California, for the most part, about these companies. And again, I don't mean to interrupt, but the simple answer to your question is there's no special exception under the three-quarters of a century of jurisprudence, starting with the Saucony Oil case from the Supreme Court in 1940 that recognizes that the general rule doesn't apply in cases of heavily regulated industries. But there's no case that says to the contrary, though, is there? It's kind of an open issue of whether heavily regulated industries are different in this setting. But, Your Honor, respectfully, I think the policies under the antitrust laws typically arise in industries that are regulated because those industries tend to be regulated because they are prone to anti-competitive behavior. That's one of the reasons why they're regulated. But in this particular case, AT&T has not come in and claimed an interest for itself. Only Apple has sought that interest, has identified and claimed that interest. It would be an expansion. Kennedy. I'm sorry. I thought there was a letter from counsel for AT&T that, in fact, claimed such an interest. I forget what the E.R. number, but I thought there was such a letter. There is a declaration, two declarations, that were submitted by AT&T's outside counsel. And what she says — Is she even current counsel? All I can see from the declaration is that she was former counsel. That is correct, Your Honor. And what she says is AT&T's interest in this case is essentially filing a motion to dismiss if it were joined under the terms of its arbitration agreement, which she points out had already been granted by Judge Ware and would be sure to be granted again. So AT&T doesn't want to be a party to this case. They are happier not being a party to this case, not defending their business practice in this case, not being present in the district court at all. They don't want to be here. This was Apple's choice to say that we either had to sue AT&T as a necessary and indispensable party, and I see that my time has already expired. Kennedy. Okay. Well, let's do — I don't normally do this, but we'll give you a little bit more time, even though you're expired. Let's hear from Apple and my colleague has questions. Let me ask a question, if I could. I'll do it on my time. The district court was governed by Wilbur. How do you distinguish Wilbur?  The answer to that, Your Honor, is that Wilbur says, and I think Wilbur is correctly decided, Wilbur says that these decisions are all fact-specific. The court in Wilbur says that the purpose of that lawsuit was to decimate that contract. This contract here, in our case, had already expired. The contract that was issued, that was at issue in Wilbur, was, in fact, not already expired. It was a live contract, and the court said that the purpose of that lawsuit, which, interestingly, the district court did not even believe the contract had been ratified by Governor Locke at the point in time when the district court decided the case and concluded that Wilbur was not a necessary party, the district court was laboring under the impression that the contract hadn't been formed yet. The court of appeals said, but no, the contract had, in fact, been approved by the governor of the State, and so, therefore, was a live contract. Again, we have an Indian tribe involved in a Rule 19 case where there is a live contract, the rights under which would be affected by the outcome of the litigation. The live contract here, in this case, when Judge Ware made his decision and did not consider the live contract here, did not have the rights that Apple argues in its brief are so vital to AT&T that it needs to be added as a party, and this case in no way sought to decimate, to use the terms of the court in Wilbur, to decimate the contract at issue, the live contract that was at issue in 2012 when this complaint was filed and when Judge Ware decided to use it. Kagan. Ginsburg. Do you have equitable ---- Kagan. Oh, sorry. Roberts. Just one further question. Kagan. Yes. Roberts. There's been a State case filed which you've been beneficially affected. Does that case in any way take away from this case? That is, were decisions made, which you won in the State side, that you no longer have to come see us? Now, I'm not counsel in the Van Zandt case. Roberts. Yes. I'm not counsel in that case, but, no, they're completely different cases. Let me explain. Van Zandt concerns 3G technology and whether the iPhone was delivering the advertised speed on its phone, and Apple's defense in that case was that the speed that the phone performs is a function not just of the hardware in the phone, but also of the network on which it operates, and in that case, it was AT&T's network. And that has nothing to do with the revenue-sharing agreement or the exclusivity that's at issue here. We submitted it because the Court's analysis on whether AT&T was a necessary and indispensable party in that case is under the State's rule, which is virtually identical to Rule 19. Except that you don't have Wilbur over there, and the case of Wilbur is a problem. Correct. But if you read the Court's opinion in that case, and I will report that two days ago the California Supreme Court refused to hear an appeal from the appellant court's decision in Van Zandt, that analysis is essentially the same kind of analysis that we believe should have been applied here and would lead to the same result here that it did in the Van Zandt case, which is that AT&T is neither necessary nor indispensable. And that's true unless you're wrong on Wilbur. Okay. I'm sorry. I wanted to follow up on something about Wilbur. So you're saying the contract here is over anyway. But as I understand it, you have equitable relief claims. And I'm wondering why, if you could just drop them to eliminate this problem, why do you have damages and equitable relief claims? Your Honor, you're exactly right. And the district court never reached the question of if, assuming AT&T was a necessary party, it never reached the question of whether AT&T was indispensable. And in that, in that, all of the courts, the teachings of all the courts, including the Occidental Petroleum case that Apple relies on very heavily, says, look, we can easily fashion a remedy that will avoid this problem simply by saying no equitable relief. It's a simple problem.  Not a problem. And yet, there's no question. But what is the equitable release that you're seeking, and why are you still seeking it given all this? We had asked that Apple be compelled to provide the unlock codes to anyone who wants to change their phones. And that's why Apple argues that AT&T has an interest in preventing that, citing the expired contract, which stopped Apple from both unlocking the phones itself and sharing the unlock codes with third parties. The new agreement between Apple and AT&T that was entered into in February of 2011 does not contain that second limitation. Apple can't itself unlock phones, but there is no prohibition in the second agreement for Apple sharing those unlock codes with others. But you can't do that with AT&T. So your equitable relief is essentially at this point for people who bought phones more than four years ago who are still under the original contract? I mean, do you have any idea how many of those people even exist? Whatever small number of them there are, that is correct. But if the Court were to conclude that the equitable remedy makes AT&T an indispensable party, then under the flexible standard that Rule 19 is supposed to adopt, the solution to the problem is not to throw the baby out with the bathwater, but to simply get rid of the bad bathwater and say, look, you can proceed with your claim for money damages, but not for equitable relief. Thank you very much, Your Honors. Thank you. We'll move to some of the other issues. Let's hear now from Apple. Thank you, Your Honor. My name is Daniel Wall from Latham & Watkins, and I represent Apple. And I bought this phone Monday, and it's locked. Let me begin with what this case has always been about. From the very beginning of this case, when it was in its iteration as the iPhone 1 case, it was a continuation of a battle that has been raging between network carriers and various consumer groups for a very, very long time about the practice of having SIM locks on phones. And, Judge Smith, you're absolutely right. Not only is this something that is an active legislative topic, but it has been the subject of countless lawsuits and other public policy initiatives, all of which is intended to try to wrest away from the network carriers the unlock codes, so in the name of allowing consumers to buy a phone that's on one network and move it to another network. If you look at the governing document of this, in this case, which is the complaint, which is contained, which begins at ER 44, there is allegation after allegation after allegation about the network carrier's control over the unlock code, particularly beginning at ER 52, excuse me, ER 50, in the section evocatively titled, The Cell Phone Industry's History of Misusing Locked SIM Cards. And the case proceeds from there. It has to be understood in this case that for over four years, prior to this case, prior to the decision that Judge Ware made to send the iPhone 1 case to arbitration, he sat in his courtroom and watched not just myself representing Apple, but Ms. Lalew and others representing AT&T fight this very case with the same legal theories. And AT&T appeared at every hearing claiming its legal interests in every way that one does in the course of a litigation. It really is pretty different. Now, but they were sued there, and now they're not. So isn't that a very different situation in terms of how much interest they have? I don't think the — what it means is, is that the tactic that has been employed to circumvent Concepcion and the later decision in American Express is to not name them as a party, and to therefore not have them have a damages exposure, and to claim upon that basis that the — that the person doesn't have a legal interest in the proceeding. Keep in mind, in every single Rule 19 case, the absent party doesn't have a damages exposure because they've been left out of the case. That is just the beginning of the analysis. Kennedy. Let me ask you this. I ask your opposing counsel at the very beginning of his presentation whether if the contract, the wireless services agreement, did not contain an arbitration clause, whether the plaintiffs would have sued AT&T. And the answer was yes. What bearing, if any, should that have on our analysis here in terms of how important — in this particular case, we've got two giants involved. Right. How important is that in our determination of whether AT&T is an indispensable party? I don't — and I actually don't think it has a technical bearing on the Rule 19a question. But to me, it's everything. Because this entire lawsuit from its inception is a device, a procedural device, to avoid the particular legal interest that AT&T successfully advanced in the iPhone 1 case, which was its arbitration agreement, which Judge Ware held also extended to Apple under the principle of equitable estoppel. And so the whole thing from inception is about that. And I think that's very important, because virtually every reported Rule 19 case is about a different and much more serious problem, which is that someone who is — who has a legal interest in the case, whose interests are vitally affected, cannot be joined. It is impossible to join them. Putting courts in this sort of Hobson's choice of, do we proceed without them with the harm that might do, or do we not have the case? Maybe in tribes can waive tribal immunity. I mean, so you could join them if they were willing to be joined and wanted to be involved in the litigation to protect their interest. Precisely. But the point is here, all of this is being done not in the name of inability to join, which is the subject matter of Rule 19, but rather the perceived tactical advantages or disadvantages in trying to resist arbitration of taking a case that was always about AT&T and essentially pretending that it was not AT&T. If one were to just read line by line the complaint in this case versus the original iPhone case, you'll see that the vast majority of it is word for word the same, except probably with the auto-correct feature of some word processing program, the word ATTM has been substituted for the word Apple over and over again, including in places where it makes the statement have no common sense meaning at all, because things that are clearly the carrier's interests are somehow ascribed to Apple. The rule itself, Rule 19a, says a person who is subject to service of process and whose joinder will not deprive the court of subject matter jurisdiction must be joined. It is not unless it messes up my strategy. And it is certainly and if we were ever going to establish an exception for when there was some sort of strategic rationale for manipulating the parties, I hope it wouldn't be when the explicit purpose of it is to try to circumvent a United States Supreme Court decision that upheld the enforceability of the very arbitration clause that is at issue in this case. But your adversary argued that it didn't make any difference because AT&T didn't have a dog in the fight. And let me address that, Judge Wallace, because that is something that, with all due respect to counsel, he's simply misrepresenting the record. That is just flat, not true. And not only is that contrary to the Leleau Declaration, but let's go to the record. Let's be very specific about it. The allegations in this case that deal with AT&T's interests are begin in the complaint in the paragraphs that I mentioned earlier, but also in specific paragraphs that attack the provisions that control the unlock codes. Now, remember, I would say that there's broadly speaking three very obvious AT&T interests in this case. First, the overall, the direct object of the case is to have declared unlawful as a conspiracy to monopolize the distribution agreement to which AT&T is a party. Number one. Number two, it has a specific purpose of trying to declare unlawful and enjoin the provisions by which Apple cannot share the unlock codes. And three, AT&T has its interest in the wireless services contract, which we can come back to in a minute. But let me focus on the unlock codes, because that's the one at which I just think that you're not being told the truth. If at ER-77 and ER-80 in the record, they are excerpts, Judge Friedland, that's for sure, but you have the particular provisions of the 2006 agreement and the 2011 agreement that obligate Apple not to unlock phones. And those, that provision, so looking at 2006, it says singular AT&T will own the term and the wind-down period. Is there anywhere in this record where we have a definition of term and wind-down period? There is not. There's nothing in the record. In fact, the wind-down period was four years from the termination of the agreement. It was still in effect. And remember, the rationale for this was that the contract was not in the record. I'm struggling with the idea that you're relying on this contract, and you have the burden to show that they're indispensable and you're using the contract to show it, but we don't even know. We can't read this contract at all because we don't have it. Then, Your Honor, then I will simply resort very quickly to the 2011 agreement, as to which there's no problem with that. Well, but the 2011 agreement talks about if they invoke a SIM solution, and we don't have we don't know whether they did that either. You do have that, Your Honor. It's at ER 80. And what that what counsel has just got it completely backwards as to the effect of the 2011 agreement. It actually makes AT&T's control over the unlock codes greater, not lesser. But it says, if Apple elects to use a SIM solution not currently offered by AT&T's SIM suppliers, how do we know whether they did that? Let me explain the provision. At the time of the original agreement, the SIM solutions that Apple used, it had to obtain from AT&T's suppliers. They come locked. It's just it's just the way it is. They come locked. The reason that the 2011 agreement is different is because by that time, technology had advanced, and there had been a development of something called universal SIM, which is carrier agnostic. That provision, what that says, if you read the whole provision that's in the record, is it says you can buy it from our carriers, in which case it's going to be already locked to AT&T, or you can buy it you can buy a universal SIM. That's what that really means. But if you do, then you have to turn over the unlocked codes to us and agree that you will not give them up, and it states that it is specifically for the benefit of AT&T, quote, to preserve AT&T's relationship with its wireless customers, end quote. Remember, the background to this, which I think Judge Smith alluded to, was that the reason this unlock these unlock codes exist at all is because the phones are licensed, or they're, in today's model, the one that I bought this week, it's the rental model. I don't actually own this. I will in 24 months, but I don't right now. I'm paying it off. And they don't want people to simply take the phone somewhere else and perhaps not pay them. That's not our issue. That's not an Apple issue. Of course, everybody has to honor the business interests of their partners, but that is a carrier issue, and it isn't even just an AT&T issue. I can tell you that Apple deals with over 100 carriers around the world, and every single one of them has some kind of unlocking policies that are used to preserve the value of their contracts. Kennedy. Counsel, I want to go back to something you said. I think you were talking to my colleague, Judge Friedland, at the time. I think you said something like that the contract had four years to go or something when Judge Ware was ruling. You were talking about the 2006 agreement, right? The wind-down period was a four-year period. Okay. Tell me about the wind-down period, because I'm not sure I've focused on it or I haven't seen the wind-down period. It's not. Your Honor, I have to be honest. It's not in the record. Okay. It isn't in the record. But my — by the way, neither is there in the record any evidentiary foundation for the argument of appellants that AT&T's interests have completely expired. That's simply an assertion that they're making. This is extremely important to me. The — if there's a four-year wind-down period in that contract, then it's not an old contract. It is ongoing. And if nobody even knows what it is, how can the Court determine who's at fault, et cetera, et cetera, et cetera? I think that's a — it's a critical issue, because the question is whether the Court determines that. This is the Rule 19 issue. This is the question of whether AT&T potentially has a — a legal interest. But wait. You have — you have the burden of showing that they do have a legal interest that — that means they have to be here. And I don't understand how you can show that without giving us the contract that says there are four more years here. There's three things. One, the — the four-plus years of 18 defending the exact same claims. Counsel likes the Van Zandt opinion. It's a State court opinion. But for what it's worth, it has an explicit holding in it that a party who has defended prior litigation on the same subject matter has claimed an interest in that — in that subject matter. And it seems to me obvious. And moreover, Judge Friedland, you have to put yourself — this is here on a question of whether Judge Ware abused his discretion. You have to put yourself in — in his shoes. He sat for four years listening to counsel rail against AT&T as the monopolist, as the person who was charging the supercompetitive pricing, as the person who was charging the international roaming fees, as the person who created this very strange form of monopoly power that they derive from — from the Nucal decision. And then when Concepcion came down, the next day, just like that, they were saying, well, this isn't really about AT&T. And I think Judge Ware can be forgiven for being a little pert in dealing with that. He addressed it, the — how the claims were intertwined with AT&T at length in the arbitration orders, including the one against Apple. And then this comes up again. And I think we're being — I think counsel is being unfair to him in — in making it sound like he didn't analyze this. He states the — the rule correctly. And then, most importantly, at ER-20, you have this very long block quote of — of allegations from the complaint, which are about AT&T, AT&T's monopoly, AT&T's pricing. I mean, we have a general rule, though, about joint tortfeasors, and allegations in a tort case against joint tortfeasors are always going to implicate both, right? But not like this. This is a conspiracy to monopolize case. And — and in conspiracy to monopolize cases, you often have the pharmaceutical company without the generic as a defendant, right? I have been doing this for 35 years. I have never before this seen a case ever of conspiracy to monopolize where the monopolist wasn't part of the case. And — and that's — and that's Wilbur. Wilbur, the tribe — In Hatch-Waxman — in Hatch-Waxman litigation, where you have a — a brand pharmaceutical company and a generic, you don't think the brand is ever sued without the generic? Your Honor, it — it may have happened, but I can — but I can tell you, in Wilbur, the tribe was the monopolist. In Laker, this ACL entity was the one who actually controlled the slots. Remember, the holding in Laker was that they were only indispensable to the slot allegation, not to other allegations, so it was very specific. They said if you're going to complain about slots, the — the party who controls the slots is indispensable. In — in Judge Pragerson's decision in Occidental, a long time ago, he was a district court judge, but he — he says that the — the emirate of Sharjah — I'm sure that's not how it's pronounced, but something like that — was indispensable because all of this was about the control of its oil concessions, and — and for that particular reason, it was the stakeholder. Here, the essence of this case, despite the fact that they try to make it about other things as well, is about AT&T's ability to control consumers and not have them go to — to other carriers for service. We aren't the monopolist. We aren't the ones who's charging these prices. And — and how are we to defend this case? You know, Judge Smith, your — your question, they've acknowledged that this is a tactical ploy for — for — for them. They try to suggest, yeah, but it's just a tactical ploy for us. Seriously, how do we defend a case which is about AT&T's pricing, that its — its — its competitive dynamics against other carriers, its roaming fees, all of these things, without AT&T at the table? If you're — if you're correct, if you're correct that there's nothing in the record to show that AT&T is out of the fight and they're still in the mix, then I take it's your position that Wilbur controls and there's no abuse of discretion. Is that — is that your argument? Yes. I — I believe that all that Judge Wehr did, understanding the context of this case as he did from the years of the iPhone 1 litigation, was say that — that — that there is a very limited fact-dependent exception to the — the principle of joint liability. It's recognized in Laker, Occidental, Wilbur, and a few other cases, which — which state that — that when you don't have just an ordinary joint tortfeasor, but the allegations have — make the absent party this — this central player, this — the — the sine qua non of — of the case, the monopolist, for example, would be decimated, that under those circumstances a district judge has discretion to say that — that Rule 19 applies. It is, to me, just an application of the — of the general — we — we tried very hard in the law not to have one rule abrogate another. We seek harmonization. And, Judge Wallace, what I think that — that you ruled in — in Wilbur, what Judge Pragerson ruled in Occidental, is that these rules can be harmonized by having a very narrow, limited exception. And if you line up — let's take the four cases. If you take Wilbur, Occidental, Laker in this case, clearly, this is the case in which the absent party is the most central. I think we're going to have to cut it off. I understand, Your Honor. I want just one — one more question. Okay. Very brief. In light of the cases that you have cited, are we reviewing Judge Ware's ruling for abuse of discretion, or is this a pure legal issue, or are we reviewing it de novo? I think you're reviewing it for — for a — an abuse of discretion, but it's nuanced. And if you — and if I may, let me — what this Court has clearly said is that the Rule 19 determinations are reviewed for a — an abuse of discretion unless they depend upon the determination of a legal issue, which it is then ruled de novo. Okay. I — I believe that the question of whether AT&T potentially has a legal interest here, which, as far as — as Judge Ware needs to go, is a — is a mixed question. Okay. And as a result of that, would be subject to the abuse of discretion standard. Thank you, Your Honor. Thank you. Well, Howard, we're going to give you a couple of minutes. We ran you over before, so take — take two minutes, and I know you'll be brilliant and direct. And I'll try to be succinct. Your Honors, I — I think the review in this case is de novo. I — I think that this is a mixed-bag question, and it is involving the application of law. One of the issues that I'd like to address very quickly is Apple's argument that the contract, the new contract now, provides greater restraints on Apple's ability to release the unlawed codes than the old contract. And I'm simply going to refer the Court to the two provisions. They're there. They can be read in their — such as we have them, they can be read in verbatim and we cite the original contract is on the page 77 of the reproduced record. The new contract is on page 80 of the reproduced record. And clearly, Apple has given up — AT&T has given up some control over those unlawed codes. One other point — an additional point I'd like to make is to talk a bit about Wilbur. In the time that I had to sit while Apple was arguing, I did look at Wilbur, and I — and as I described it, the Court says there that under the — under Wilbur's logic, under the argument, one seeking to nullify an agreement could simply sue one of his signatories and then argue the remaining signatories were not necessary. I am reading, Your Honor, from page 31 of the Lexis citation, and I believe that is page — I'm trying to get the official citation. It's page 1114, 1113 carrying over to 1114 of the official citation. One seeking to nullify an agreement could simply sue one of the signatories and then argue the remaining signatories were not necessary. And then the Court says the general rule is exactly the opposite. All parties to a contract are necessary in litigation seeking to decimate that contract. We're not seeking to decimate the contract. All of the issues that counsel identified in the very end of his argument about how difficult it would be for 18 — for Apple, an active participant in this monopoly, for Apple to defend itself in AT&T's absence are issues of Apple's concern, not of AT&T's concern. And for those reasons, we think that the Court made an error. Kennedy. We thank both counsel for very fine arguments, very helpful to us. Excellent argument. We don't always have such high-level counsel here, and we appreciate it. Come back and see us any time. No. The case just argued is submitted. The Court's going to take a five-minute break, and we'll be right back.
judges: Wallace, Smith, Friedland